UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\*\*\*

FRANK MACIAS,

     Petitioner

v.

CALVIN JOHNSON,[1] et al.,

     Respondents

Case No. 3:15-cv-00461-RCJ-CLB

ORDER

Petitioner, Frank Macias ("Petitioner" or "Macias"), filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 ("petition"). (ECF No. 6.) Macias challenges his convictions for robbery and attempted murder, each with the use of a deadly weapon, and possession of a firearm by an ex-felon, on the grounds trial counsel was ineffective. (ECF No. 6 at 3.) This matter is before the Court for adjudication on the merits of the remaining grounds of the petition.[2] As discussed below the petition and a certificate of appealability are denied.

///

///

///

---

[1] According to the state corrections department's inmate locator page, Macias is incarcerated at High Desert State Prison. The department's website reflects Calvin Johnson is the warden for that facility. At the end of this order, the Court directs the Clerk of Court to substitute Calvin Johnson for respondent Renee Baker, under, *inter alia*, Federal Rule of Civil Procedure 25(d).

[2] The Court previously dismissed grounds 2 and 5 as conclusory. (ECF No. 32 at 2–3, 7.) The Court further determined grounds 1(a), 1(b), 1(c), 3 and 6 are unexhausted and Macias submitted an affidavit abandoning these unexhausted claims. (ECF Nos. 32 at 3–7; 44 at 4; 46.) There does not appear to be a ground 4 in the petition. (ECF No. 6.) Thus, the remaining grounds of the petition are 1(d), 1(e), and 1(f). (ECF No. 6 at 3.)

1

2

## I.      Background[3]

### A.      Macias shot Carlos Acosta

Carlos Acosta testified that on February 3, 2007, he returned home from a family gathering around one or two in the morning and took a stroll around the block near his house to smoke a cigarette. (Exhibit 41 at 26–27; ECF No. 24-23 at 26–27.) Acosta had a methamphetamine pipe in his possession, and although he admitted he smoked methamphetamine prior to the family gathering that started around 8:30 p.m., he denied consuming drugs or alcohol at the gathering. (*Id.* at 27, 32.)

Acosta said he knew Macias as "Demon" and "Frank" and interacted with him at parties. (*Id.* at 27–28.) As Acosta was walking, he saw Macias drive up in a red Cadillac. (*Id.*) Acosta said Macias got out of the vehicle, put a gun in his face, told him, "Pocket check" and "wanted everything in [his] pockets." (*Id.*) Acosta told Macias he could have "30 bucks" but wished to keep $20 to buy diapers. (*Id.* at 28–29.) Macias told Acosta he wanted it all and held the gun in Acosta's face while he took $50 from Acosta's pockets. (*Id.*) Acosta called Macias a "piece of shit," and started walking away, and Macias replied, "Yeah, piece of shit," and shot Acosta in the back. (*Id.*) Acosta saw Macias drive away, and then ran home and called 911. (*Id.*) Acosta told the 911 dispatcher the shooter was in a red vehicle. (*Id.* at 30.) Acosta said he went into shock when he saw his own blood and passed out when he saw the ambulance. (*Id.*)

On cross-examination, Acosta admitted he told the dispatcher he did know the color of the gun, but at trial claimed the gun was chrome. (*Id.* at 33–34.) He admitted he told the dispatcher he knew the person who shot him, he did not really know the shooter, and did not know who shot him. (*Id.* at 34, 36.) Acosta accounted for these conflicting statements by explaining he was in shock and didn't know what he was saying at the time. (*Id.* at 36.) He agreed he was uncooperative with police just after he was shot but denied telling family members not to cooperate with

---

[3] The Court makes no credibility findings or other factual findings regarding the truth or falsity of the evidence from the state court. The Court's summary is merely a backdrop to its consideration of the issues presented in the case. Any absence of mention of a specific piece of evidence does not signify the Court overlooked it in considering Macias's claims.

1   authorities. (*Id.* at 35–36.) He also denied telling police anything about the phrase "You done a
2   girl dirty." (*Id.*)

3          University Medical Center trauma physician Jay Coates performed surgery on Acosta's
4   gunshot wound. (*Id.* at 40–41.) Coates said when Acosta arrived at the hospital, he exhibited a
5   gunshot wound to his back and early signs of shock. (*Id.* at 42.) Coates removed the bullet and
6   repaired Acosta's transected colon. (*Id.* at 42–43.)

7          **B.     Macias made incriminating statements to James McKay.[4]**

8          James McKay testified Macias, whom he also knew as "Demon," showed up at his house
9   at 5:30 a.m., on February 3, 2007, and they went to a casino. (Exhibit 44 at 26–27: ECF No. 24-
10  26 at 26–27.) McKay did not see Macias with a gun that day but admitted he told police that Macias
11  told him he had an altercation earlier that morning, used his gun to shoot at someone, and "got real
12  sloppy." (*Id.* at 27–28.) McKay also admitted he told police that Macias "waves" a small silver
13  gun "around all the time." (*Id.*)

14         After they departed the casino, McKay drove Macias's red Cadillac to McKay's cul-de-sac
15  but kept driving when they spotted police. (*Id.*) Although Macias asked McKay to drive the
16  vehicle, it was not uncommon for them to drive each other's vehicles. (*Id.* at 27, 30–31.) McKay
17  said the police stopped their vehicle and searched his house as part of a separate investigation into
18  vehicle thefts that included stolen vehicles parked near McKay's home. (*Id.* at 26, 28–30.) He
19  admitted he had three prior felony convictions, including grand larceny and attempted burglary,
20  and believed something might have tied him to the stolen vehicles. (*Id.* at 29.) He said he was led
21  to believe he would go to prison if he was charged with another theft-related crime, but such
22  charges would not materialize if he gave a statement concerning Macias. (*Id.* at 29–30.) He said
23  he was told that if he did not cooperate, something bad might happen to him or they might call
24  Senior Services to take away his grandmother; however, police did not find any evidence with
25  which to charge him. (*Id.*)

26  ///

27

28  _____
    [4] A material witness warrant issued for McKay's arrest because he did not wish to testify and previously
    refused the State's subpoena for trial. (Exhibit 44 at 26; ECF No. 24-26 at 26; Exhibit 44 at 5; ECF No. 24-27 at 5.)

Las Vegas Metropolitan Police Department ("Metro") officer Randy Stamps testified he and his partner stopped McKay and Macias in the red Cadillac, arrested Macias on outstanding warrants, and although they found no firearm, they found Winchester bullets in the center console of the vehicle during an inventory search. (Exhibit 44 at 6–8, 10; ECF No. 24-27 at 6–8, 10.) Metro detective Jeffrey Swanbeck testified he went to the scene of the traffic stop and discovered the red Cadillac had no license plates and neither Macias nor McKay had proof of insurance or registration. (Exhibit 44 at 5–6; ECF No. 24-26 at 5–6.) Swanbeck said Macias denied having a gun that day and denied everything about the shooting of Acosta. (*Id.*)

### C.    Acosta positively identified Macias as the shooter.

Detective Swanbeck testified he discovered from Acosta's 911 call that the shooting involved a red vehicle, so he prepared a six-photo lineup that included Macias's photograph (but not McKay's photograph) and showed the lineup to Acosta after surgery. (Exhibit 44 at 6–7, 10; ECF No. 24-26 at 6–7, 10.) Swanbeck testified he read an admonition to Acosta that the shooter may or may not be in the lineup, showed Acosta the lineup photos without corresponding names, and Acosta immediately identified Macias and initialed his identification. (*Id.* at 7.) Swanbeck said although Acosta was fresh out of surgery, he "pointed directly" to the photo of Macias, "seemed to know what he was doing," and said that was not his first encounter with Macias. (*Id.* at 9–10.)

Acosta testified he identified "Demon" as the shooter when he viewed the photo lineup at the hospital. (Exhibit 41 at 31–32; ECF No. 24-23 at 31–32.) Acosta testified he had difficulty writing after surgery but confirmed the accuracy of his statement (in Swanbeck's handwriting):

> Demon was the person who robbed and shot him. Acosta has known Demon for a while and has known him to drive a red four-door Cadillac with no plates for two to three weeks. Although . . . Acosta was in the hospital bed, as he was shot in the back, he was still able to immediately recognize and positively identify Macias as Demon and the person, who robbed and shot him. Acosta pointed to Number 2 and initialized him.

(Exhibit 41 at 31–32; ECF No. 24-23 at 31–32; *see also* Exhibit 44 at 7–8; ECF No. 24-26 at 7–8.) Acosta testified he had no doubt Macias was the man who shot him. (*Id.* at 32.)

Swanbeck said Acosta led him to believe the shooter told Acosta "You did a girl dirty," pulled out a gun, demanded money, and Acosta tossed $30 at the shooter. (Exhibit 44 at 9; ECF

4

No. 24-26 at *Id.* at 9.) Swanbeck said Acosta did not appear to be under the influence of drugs, although he looked like he was in pain. (*Id.*) Swanbeck did not ask Acosta whether he partook in any illegal narcotics or was intoxicated but agreed it was important to do so when asking an individual to identify someone involved in a crucial incident. (*Id.* at 9–10.)

### D. Police found circumstantial evidence connecting Macias to the shooting.

Forensic scientists Crystina Vachon analyzed gunshot residue particles taken from the front and back of the portions of Macias's hands associated with shooting a handgun, and opined Macias "may have discharged a firearm, handled a discharged firearm, or was in close proximity to a discharged firearm." (Exhibit 44 at 18–19; ECF No. 24-26 at 18–19.) Vachon said the gunshot residue kit manufacturer recommends taking samples within four hours of a shooting. (*Id.*) Although Macias's residue samples were taken 9.5 hours after Acosta was shot, it did not change Vachon's conclusions and opinions. (*Id.*) Vachon admitted she could not say Macias "definitely" discharged, handled, or was in proximity to, a firearm. (*Id.*)

Forensic scientist Matthew Noedel compared the Winchester bullet cartridges found in the red Cadillac to the bullet retrieved from Acosta during his surgery and concluded they were consistent in design features, including crimping and the zinc/copper ratio. (Exhibit 44 at 14–17; ECF No. 24-27 at 14–17; Exhibit 48 at 16–18; ECF No. 24-31 at 16–18.) In response to a juror's question, however, Noedel acknowledged the zinc to copper ratio is approximately identical for all Winchester bullets except for small variations. (Exhibit 48 at 18; ECF No. 24-31 at 18.)

### D. The defense presented potential alibi witnesses.

Norma Kelley testified that around the first of February 2007—and possibly February 2—between 9:00 p.m. and 10:30 p.m., she pulled into her neighbor's driveway and backed into Macias's red Cadillac which was parked across the street. (Exhibit 48 at 4–9, 11; ECF No. 24-31 at 4–6, 9, 11.) Kelley never met Macias before the accident, and he gave her a piece of paper with his phone number and the name "Frank." (*Id.* at 5, 7.) Based on a photograph, she identified the dent she caused to the rear quarter panel of Macias's vehicle. (*Id.* at 9–10.) She said she left after the accident, returned home around 1:00 a.m., and Macias's vehicle was still parked where she hit it. (*Id.* at 6.) District Attorney investigator, John Nicolan, testified that during his interview with

Kelley, she did not recall the precise date of the accident and initially told him the accident occurred at 8:00 p.m., later told him it occurred at 10:00 p.m., but never told him it occurred at 11:00 or 11:30 p.m. (Exhibit 49 at 5; ECF No. 24-32 at 5.)

Kelley's neighbor, Angel Barajas, testified he had known Macias for about fifteen years as of February of 2007 and never heard anybody refer to Macias as "Demon." (Exhibit 48 at 19, 25; ECF No. 24-31 at 19, 25.) He said that on a Friday night in February of 2007, Macias "showed up in a [red] Cadillac that his parents had just got him" that still had a dealer sticker on it and no license plates. (*Id.* at 20, 28.) After visiting inside his house for several hours, they hung out in the garage drinking beers and talking until around 10:30 or 11:00 p.m., when they heard a "crash", and realized Barajas's neighbor hit Macias's vehicle. (*Id.* at 21–23, 25.) Barajas said the neighbor apologized and agreed to pay for the repair, and then he and Macias continued to hang out until Macias left. (*Id.* at 22.) Barajas initially said Macias left around 2:30 or 3:00 a.m., but admitted he told an investigator Macias left around 1:00 or 2:00 a.m., and on cross-examination stated Macias left at "2, 2:30, somewhere around there." (*Id.* at 22–24.)

The jury convicted Macias as charged of (1) robbery with use of a deadly weapon, (2) attempted murder with use of a deadly weapon, and (3) possession of a firearm by an ex-felon, and the state district court sentenced him to *inter alia* 24 to 60 years imprisonment. (Exhibit 4 at 2–3; ECF No. 11-4 at 2–3.) Macias unsuccessfully sought direct and postconviction review. (Exhibits 62, 113; ECF Nos. 25-13, 26-23.)

## II.   Governing Standards of Review

### A.   Antiterrorism and Effective Death Penalty Act (AEDPA)

The Antiterrorism and Effective Death Penalty Act (AEDPA) provides the legal standards for consideration of the petition:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

///

6

1
2

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

3

28 U.S.C. § 2254(d).

4

A state court decision is contrary to clearly established Supreme Court precedent, within

5

the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing

6

law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are

7

materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a

8

result different from [the Supreme Court's] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73

9

(2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535

10

U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established

11

Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies

12

the correct governing legal principle from [the Supreme Court's] decisions but unreasonably

13

applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at

14

413). "The 'unreasonable application' clause requires the state court decision to be more than

15

incorrect or erroneous . . . [rather] [t]he state court's application of clearly established law must be

16

objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409) (internal citation omitted).

17

Where there is no clearly established federal law, i.e., no holding from the Supreme Court,

18

stating a particular standard or rule at the time of the state court's decision, then, by definition, a

19

petitioner cannot establish under AEDPA that the state court's decision was either contrary to or

20

an unreasonable application of clearly established federal law. *See, e.g., Carey v. Musladin*, 549

21

U.S. 70, 76–77 (2006); *see also Williams,* 529 U.S. at 390, 412 (interpreting "[t]he meaning of the

22

phrase 'clearly established Federal law, as determined by the Supreme Court of the United States'"

23

contained in 28 U.S.C. § 2254(d)(1) as referring to "the holdings, as opposed to the *dicta*, of the

24

[Supreme] Court's decisions as of the time of the time of the relevant state-court decision.").

25

The Supreme Court has held, "[a] state court's determination that a claim lacks merit

26

precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of

27

the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v.*

28

*Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for

relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult-to-meet" and "highly deferential standard for evaluating state-court rulings, which demands state-court decisions be given the benefit of the doubt." (internal quotation marks and citations omitted)).

### B.     Standards for Effective-Assistance-of-Counsel

On petitioner's claims of ineffective assistance of counsel, he must demonstrate (1) the attorney's "representation fell below an objective standard of reasonableness[;]" and (2) the attorney's deficient performance prejudiced the petitioner such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. It is a petitioner's burden to show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687.

"[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance." *Burt v. Titlow*, 571 U.S. 12, 24 (2013). When considering an ineffective assistance of counsel claim, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689 (citation omitted). On the performance prong, the issue is not what counsel might have done differently but whether counsel's decisions were reasonable from his or her perspective at the time. *Id.* at 689–90. A petitioner making an ineffective assistance claim "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. In considering such claims, a court is obligated to "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* Under *Strickland*, strategic choices made "after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* On the other hand, "strategic choices made after less than complete investigation are reasonable

precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91.

"Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,'" and when applied in tandem, "review is 'doubly so.'" *See Richter*, 562 U.S at 105 (internal citations omitted); *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as 'doubly deferential.'") (citing *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003)).

## III.   Discussion

### A.   Ground 1

In ground 1, Esquivel claims trial counsel provided ineffective assistance in violation of the Sixth and Fourteenth Amendments. (ECF No. 6 at 3.)

#### 1.   Ground 1(d)—Failure to Object to Testimony about Felony Warrants

In ground 1(d), Macias claims trial counsel provided ineffective assistance by failing to object or move for mistrial when Detective Swanbeck mentioned Macias had prior "felony" warrants. (ECF No. 6 at 3.)

Prior to the presentation of testimony, the parties agreed witnesses could indicate Macias was taken into custody on outstanding warrants. (Exhibit 41 at 22; ECF No. 24-23 at 22.) In opening remarks, the State prosecutor stated "Mr. Macias [was] arrested for some warrants that he has at the time, that's why he's picked up." (Exhibit 41 at 24; ECF No. 24-23 at 24.) In his testimony, however, Detective Swanbeck testified he discovered Macias "had felony warrants." (Exhibit 44; ECF No. 24-26 at 5.) Defense counsel did not immediately object to Swanbeck's characterization of the warrants as felonious, but objected during a trial break:

> [DEFENSE COUNSEL]: One thing to which I do have an objection, I did not lodge at the time simply because I did not want to draw attention to it. The officer who had testified earlier—bear with me—Officer Swinebeck [sic]. He had—Swanbeck, excuse me. We had discussed, we meaning Your Honor and [the prosecutor] had discussed in chambers the fact that Mr. Macias was placed in custody because he had warrants, period. And then we put that on the record. Mr. Swanbeck either accidentally or otherwise stated felony warrants. I did not want to jump up and crow

9

at that point in time. We had already admonished all the parties. That frustrated me quite a great deal, but again, I did not highlight the fact, we cannot unring the bell at that point in time.

Obviously I have an objection to that particular characterization of those warrants which may have been felony in nature, they may have been traffic warrants. It's my understanding they were going to leave it just at warrants, he did not testify accordingly. If [the prosecutor] is going to speak to Mr. McKay or any future witnesses, I would greatly appreciate it if he could admonish them specifically to adhere to what we have agreed to both off and on the record, that being Mr. Macias was placed into custody because of outstanding warrants period.

[THE STATE]: That's fine, Your Honor. I don't think there was any malicious action on the part of the detective testifying. It's not certainly something that I told him to do in court nor do I think it's really an issue. There were four felony warrants at the time that Mr. Macias was arrested that he was—that he was picked up on, so it was accurate to that degree. And I would admonish all future witnesses to specifically just say warrants and not felony warrants.

[DEFENSE COUNSEL]: And my contention was not about the inaccuracy, it was about all parties' agreement.

THE COURT: I understand what you're saying. Is there a curative instruction you want me to give or anything like that or do you think that will draw more attention to it?

[DEFENSE COUNSEL]: It very well may, Your Honor, I do not have a curative instruction prepared at this point in time. I'll—

THE COURT: All right. You think about it over lunch—

[DEFENSE COUNSEL]: I will.

THE COURT: —and if you think you want a curative instruction, I'll write it down on my list of things to ask you about.

[DEFENSE COUNSEL]: Thank you, Your Honor.

(*Id.* at 15–16.) Later that day, the state district court asked if the defense wished a curative instruction and defense counsel stated, "If I do, I'll prepare one and submit it to . . . your clerk." (Exhibit 44 at 23; ECF No. 24-27 at 23.) The jury instructions do not contain a curative instruction. (Exhibit 50; ECF No. 25-1.)

On direct appeal, the Nevada Supreme Court rejected Macias's claim that the state district court improperly admitted Swanbeck's testimony about Macias's prior felony warrants as other bad act evidence:

[M]acias argues that the district court improperly permitted the introduction of other bad act evidence. At trial, Detective Jeffrey Swanbeck testified that while Macias was detained on the day of the shooting, he discovered that Macias had

10

felony warrants, and Detective Douglas Bishop testified that Macias' companion, James McKay, had information regarding stolen vehicles. Macias objected to both comments.

Evidence of uncharged bad acts is presumed to be inadmissible. Tavares v. State, 117 Nev. 725, 731, 30 P.3d 1128, 1131 (2001), modified on other grounds by Mclellan v. State, 124 Nev. ___, ___, 182 P.3d 106, 111 (2008). Before admitting prior bad acts evidence, the district court must conduct a hearing outside the presence of the jury and determine whether "'(1) the incident is relevant to the crime charged; (2) the act is proven by clear and convincing evidence; and (3) the probative value of the [other act] is not substantially outweighed by the danger of unfair prejudice.'" Rhymes v. State, 121 Nev. 17, 21, 107 P.3d 1278, 1281 (2005) (quoting Tinch v. State, 113 Nev. 1170, 1176, 946 P.2d 1061, 1064-65 (1997)). Failure to conduct this hearing is "reversible error unless '(1) the record is sufficient for this court to determine that the evidence is admissible under the test for admissibility of bad acts evidence . . .; [sic] or (2) where the result would have been the same if the trial court had not admitted the evidence.'" Id. at 22, 107 P.3d at 1281 (quoting Qualls v. State, 114 Nev. 900, 903-04, 961 P.2d 765, 767 (1998)).

The testimony about Macias' arrest based on felony warrants and McKay providing information related to stolen vehicles alluded to prior bad acts involving Macias and his companion. While Macias had stipulated that Detective Swanbeck could testify that Macias was arrested based on outstanding warrants, Macias did not stipulate to felony description of those warrants. Therefore, the challenged testimony was inadmissible. See NRS 48.045(1).

Nevertheless, we conclude that the result of the trial would have been the same if the district court had not admitted the evidence. At trial, the victim identified Macias as the man who robbed and shot him. The victim had also identified Macias in a photographic lineup after the crime, as he had met him in the previous weeks. A search of Macias' car revealed ammunition consistent with the bullet retrieved from the victim, and a gunshot residue test revealed that Macias may have discharged a firearm. In addition, McKay told police that morning that Macias had come to his home and stated that "he had had an altercation where he had to use the gun." Based on this evidence, we conclude that any error in admitting the challenged testimony was harmless.

(Exhibit 62 at 4–6; ECF No. 25-13 at 4–6.)

In postconviction proceedings, the Nevada Court of Appeals rejected Macias's claim that counsel was ineffective in failing to request a mistrial based on Swanbeck's testimony about Macias's "felony" warrants:

[M]acias argues the district court erred in denying claims of ineffective assistance of counsel raised in his January 19, 2010, petition and supplements. To prove ineffective assistance of counsel, a petitioner must demonstrate counsel's performance was deficient in that it fell below an objective standard of reasonableness, and resulting prejudice such that there is a reasonable probability, but for counsel's errors, the outcome of the proceedings would have been different. *Strickland v. Washington,* 466 U.S. 668, 687-88 (1984); *Warden v. Lyons,* 100 Nev. 430, 432-33, 683 P.2d 504, 505 (1984) (adopting the test in *Strickland).* Both components of the inquiry must be shown, *Strickland,* 466 U.S. at 697, and the petitioner must demonstrate the underlying facts by a preponderance of the evidence, *Means v. State,* 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004).

. . . .

[M]acias argued trial counsel was ineffective for failing to object or move for a mistrial when a police officer testified he discovered Macias had felony warrants. Macias failed to demonstrate his counsel's performance was deficient or resulting prejudice. Macias' counsel objected to this testimony and the trial court overruled the objection. In light of the trial court's ruling, Macias failed to demonstrate objectively reasonable trial counsel would have raised further arguments regarding this testimony. In addition, on direct appeal the Nevada Supreme Court concluded admission of testimony regarding Macias' felony warrants was error, but the error was harmless. *Macias v. State,* Docket No. 52332 (Order of Affirmance, November 4, 2009), and accordingly, Macias failed to demonstrate a reasonable probability of a different outcome had counsel raised further arguments regarding this issue. Therefore, we conclude the district court did not err in denying this claim.

(Exhibit 113 at 2, 5; ECF No. 26-23 at 2, 5.) The state appellate court's rejection of this claim was

neither contrary to, nor an unreasonable application of *Strickland* and does not constitute an

unreasonable determination on the facts in the state court record.

The state appellate court reasonably determined counsel's conduct fell within the wide

range of reasonable professionally competent assistance. *Strickland,* 466 U.S. at 690. The record

demonstrates defense counsel made a tactical decision not to object to Swanbeck's testimony in

front of the jury. Counsel indicated he did not wish to "jump up" and "crow" about it when

Swanbeck testified. In accordance with state law, the state district court offered to read the jury a

curative instruction to atone for the error.[5] Counsel thought a curative instruction might "very

well" draw more attention to testimony but agreed to think about that option and subsequently

stated a proposed curative instruction would be submitted if the defense desired one. Counsel's

performance was not deficient because an objectively reasonable attorney could determine, as a

tactical matter, that a curative instruction might remind the jury about the prejudicial testimony

and emphasize the felonious nature of the warrants. Because a curative instruction is the proper

remedy under state law, the state appellate court reasonably determined there was no reasonable

probability the result of the proceedings would have been different had counsel pursued further

argument on the matter, i.e., a mistrial. There is also no reasonable probability the outcome of the

---

[5] According to the Nevada Supreme Court, "[a] witness's spontaneous or inadvertent references to inadmissible material, not solicited by the prosecution, can be cured by an immediate admonishment directing the jury to disregard the statement." *See Ledbetter v. State,* 122 Nev. 252, 264, 129 P.3d 671, 680 (2006) (citing *Carter v. State,* 121 Nev. 759, 770, 121 P.3d 592, 599 (2005)).

proceedings would have been different had counsel obtained a curative instruction as there was overwhelming evidence of guilt. *See supra*, pp. 10–11.

For the foregoing reasons, Macias is not entitled to federal habeas relief for ground 1(d).

## 2.     Ground 1(e)—Failure to Object to References to Macias as "Demon."

In ground 1(e), Macias alleges trial counsel provided ineffective assistance by failing to object to references to him as "Demon." (ECF No. 6 at 3.)

The identity of Acosta's shooter was at issue at trial as Macias presented evidence ostensibly in support of an alibi defense. *See supra*, p. 6. During opening statements, the State contended "[C]arlos Acosta – knew Frank Macias as Demon. That was his street name. That's the name he knew him by. Or Frank, I think he knew both, but Demon was the main name." (Exhibit 41 at 24; ECF No. 24-23 at 24.) The prosecutor further argued the evidence would show that Acosta told police "It was Demon that did this to him." (*Id.*) Acosta and McKay each testified they knew Macias by the names "Frank" and "Demon" and identified Macias as the individual they knew by the name "Demon." The State's use of the nickname or moniker "Demon" during testimony was used in the context of questions verifying the identity of Macias as "Demon" and references to Macias by the name "Demon" in closing arguments were, in the main, accompanied by argument concerning identifications of Macias and "Demon" as the same person. (Exhibits 41 at 24, 28, 32; 44 at 10, 27; 48 at 25; 49 at 6, 7, 8, 9, 14; ECF Nos. 24-26 at 10, 27; 24-31 at 25; 24-32 at 6, 7, 8, 9, 14.)

The state appellate court rejected this claim in postconviction proceedings:

> [M]acias argued trial counsel was ineffective for failing to object when witnesses and the State used Macias' "Demon" moniker during the trial. Macias failed to demonstrate his trial counsel's performance was deficient or resulting prejudice. The victim and another witness testified that they and others referred to Macias as Demon and the State posed follow-up questions regarding their relationship with Macias. The victim later testified he recognized Macias as the person who robbed and shot him because of his prior dealings with Macias. Under the circumstances in this matter, Macias' "Demon" moniker was relevant to demonstrate how the victim identified Macias and the probative value of this evidence did not substantially outweigh its prejudicial nature. *See* NRS 48.015; NRS 48.035(1). Accordingly, Macias failed to demonstrate his counsel acted in an unreasonable manner by failing to object to introduction of this information or a reasonable probability of a different outcome had counsel raised objections. Therefore, we conclude the district court did not err in denying this claim.

13

(Exhibit 113 at 4; ECF No. 26-23 at 4.) The state appellate court's rejection of this claim was neither contrary to, nor an unreasonable application of *Strickland* and does not constitute an unreasonable determination of the facts in the state court record.

The identification of the shooter was a critical issue in the case and the two most crucial witnesses, Acosta and McKay, knew Macias by the name "Demon," as well as by the name "Frank." As such, a reasonable defense attorney could determine it was futile to object to the State's use of the name "Demon" in the context of testimony and argument about the identification of Macias. Moreover, given the overwhelming evidence of guilt, i.e., Acosta's identification, McKay's testimony about Macias's statements, and the circumstantial forensic evidence, there was no reasonable probability the result of the proceeding would have been different had counsel objected to references to Macias's moniker or nickname. *See supra*, pp. 3–5.

The state appellate court reasonably determined counsel's failure to object to references to Macias's nickname, "Demon," did not fall outside the wide range of reasonable professionally competent assistance and does not constitute deficient or prejudicial performance. *Strickland*, 466 U.S. at 690. Macias is not entitled to federal habeas relief for ground 1(e).

### 3. Ground 1(f)—Failure to Investigate and Obtain Acosta's Medical Records Before Trial.

In ground 1(f), Macias alleges trial counsel provided ineffective assistance by failing to investigate and obtain Acosta's medical records, including a toxicology report, before trial. (ECF No. 6 at 3.)

Following the testimony of Acosta's surgeon, Dr. Coates, defense counsel objected to admission of Acosta's medical records because some of them were not previously provided to counsel and counsel needed additional time to review them:

> THE STATE: [I] would move for admission of the records that he's got in front of him in his file. They are a COR production.

> THE COURT: The records as he has them are Exhibit 49. [Defense counsel], do you have concerns regarding that?

> DEFENSE COUNSEL: Your Honor, my concern is that I haven't seen these records as of yet. Evidently there is a COR attached. I was not provided with these.

///

1    I have maybe half inch of meds, this is about two inches. I'm not sure who brought
     it, but I haven't had a chance to go through it.

2    THE STATE: That's fine, he can review them and—

3    DEFENSE COUNSEL: If we could hold off, if I could have a copy of that, review
     it this evening.
4
5    THE COURT: We'll look at them at the evening [sic] when you don't get to go
     home, but the jury does. Do you have any cross-examination?

6    DEFENSE COUNSEL: I do, Your Honor.

7    THE COURT: Okay.

8    DEFENSE COUNSEL: Unfortunately, some of it might be predicated upon the
     information contained in those documents.
9
10   THE COURT: He said he reviewed the operative report. Although that stack of
     documents may be pretty high, he said he looked at the operative report.

11   DEFENSE COUNSEL: That's correct. Maybe I can clear things—

12   THE COURT: Which is like four pages.

13   DEFENSE COUNSEL: Maybe they'll clear some things up.

14   THE STATE:  Which counsel has, Your Honor. So.

15   DEFENSE COUNSEL: I do—I did receive the operative report this morning, Your
     Honor, but. [sic]
16

17   (Exhibit 41 at 44; ECF No. 24-23 at 44.)

18        Defense counsel thereafter cross-examined Dr. Coates, who stated a toxicology report, if

19   any, would be contained in Acosta's three-inch-thick stack of medical records. (*Id.* at 44, 46.) The

20   state district court subsequently arranged to provide a complete copy of the medical records to

21   defense counsel and defense counsel reserved the right to recall Acosta "depending upon what's

22   in the med [sic] records." (*Id.* at 46–47.) The next day, counsel stated the defense did not object to

23   the admission of Acosta's medical records into evidence. (Exhibit 44 at 2; ECF No. 24-27 at 2.)

24        In closing remarks, defense counsel argued the medical records, which the jury could

25   review because they were admitted into evidence, contained no toxicology report:

26        [I]'ll submit to you that [Acosta] was strolling around the neighborhood at
          1 or 2 in the morning, smoking his meth pipe.
27
          And now someone had asked if there was a toxicology report or any drug
28        reports or analysis performed. You can go through Exhibit—I believe it's 48 [sic],

15

which is the med records. They're about three inches thick. I went through them when I received them on Monday; I couldn't find a toxicology report. Trust me, I looked; I checked and double checked. No toxicology report was run. So, we don't know what kind of meds [Acosta] had in his system.

We do, however, know a little bit about Mr. Acosta. He admitted on the stand that he only uses—or at least close in time to this incident, only used meth. However, on his intake services report . . . he was asked: Any recreational drugs . . . and he wrote something here but then the words marijuana are written right there. So, now at least he's admitting to the doctors that he does do some recreational drugs . . . [a]t least we know he used the meth day of and he admitted in his intake report that he had used marijuana. And it states here: approximately one week ago, doesn't reference the meth that he did that preference [sic] 12 hours. And if you want to look at this sheet, it's about two-thirds of the way down that entire stack.

(Exhibit 49 at 10–11; ECF No. 24-32 at 10–11.)

The Nevada Court of Appeals rejected this claim:

[M]acias argued trial counsel was ineffective for failing to file a pretrial motion requesting the victim's toxicology report. Macias failed to demonstrate his trial counsel's performance was deficient or resulting prejudice. During the trial, counsel questioned a doctor regarding a possible toxicology report for the victim and the doctor responded such a report would be contained in the victim's medical records if such a report existed. Counsel later asserted the medical records did not contain a toxicology report. Macias did not provide a toxicology report during the postconviction proceedings, and therefore, he failed to demonstrate counsel could have obtained such a report through reasonably diligent efforts. Macias also failed to demonstrate a reasonable probability of a different outcome had counsel sought a toxicology report because he did not demonstrate such efforts would have produced favorable evidence. Therefore, we conclude the district court did not err in denying this claim.

(Exhibit 113 at 2–3; ECF No. 26-23 at 2–3.) The state appellate court's rejection of this claim was neither contrary to, nor an unreasonable application of *Strickland*'s performance prong and does not constitute an unreasonable determination of the facts in the state court record.

The state court record demonstrates counsel had adequate time to analyze the additional medical records received during trial and reserved the right to recall Acosta to testify should counsel discover an advantage in doing so. The record further demonstrates Dr. Coates testified a toxicology report, if any, would be contained in Acosta's medical records and counsel confirmed in closing remarks that no toxicology report was found in those records. Because counsel had sufficient time to analyze the relevant medical records, and Macias presented no evidence that a toxicology report exists, the state appellate court reasonably concluded counsel's failure to seek the medical records and a toxicology report before trial did not fall below the wide range of reasonable professionally competent assistance under *Strickland*.

16

For the foregoing reasons, Macias is not entitled to federal habeas relief on ground 1(f).

**IV.     Certificate of Appealability**

This is a final order adverse to Macias. Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a certificate of appealability ("COA"). This Court therefore has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002). Under § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484 (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Applying this standard, the Court finds a COA is unwarranted. *See Slack*, 529 U.S. at 484.

**V.     Conclusion**

**IT IS THEREFORE ORDERED** that the petition (ECF No. 6) is **DENIED** in its entirety.

**IT IS FURTHER ORDERED** that a COA is **DENIED**. Reasonable jurists would not find the Court's procedural ruling dismissing grounds 2 and 5 as conclusory debatable or wrong and reasonable jurists would not find it debatable whether this Court was correct in its procedural ruling that grounds 1(a), 1(b), 1(c), 3 and 6 are unexhausted. (ECF Nos. 32 at 7; 46.)

**IT IS FURTHER ORDERED** the Clerk of Court is directed to substitute Calvin Johnson for Respondent Renee Baker.

**IT IS FURTHER ORDERED** that the Clerk shall enter judgment and close this case.

Dated:   May 9, 2022.

ROBERT C. JONES
UNITED STATES DISTRICT JUDGE